UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DEBORAH BUZZANGA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 4:09-CV-1353 (CEJ) |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment.

Plaintiff Deborah Buzzanga brings this action pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1), to recover accidental death benefits she asserts are due under a group accident policy issued by defendant Life Insurance Company of North America (LINA) to her employer. Plaintiff submitted a claim after her husband and covered dependent, Garry C. Robinett, died in a single-vehicle accident. LINA denied the claim, based upon a finding that Mr. Robinett's blood alcohol level was above the legal limit at the time of the accident. Plaintiff alleges that the denial constitutes a breach of fiduciary duty and an abuse of discretion and was arbitrary and capricious.

### I.  Background

The factual background of this case is undisputed. Defendant has submitted on behalf of both parties the administrative record created during the claims process; in addition, the Court has received the deposition and affidavit of regional claims manager Brian Billeter and defendant's responses to interrogatories.

### The Accident

Decedent Garry Robinett was killed in a single vehicle accident at 8:10 a.m. on December 22, 2007, in Mississippi County, Missouri. The Missouri State Highway Patrol determined that the accident occurred when Mr. Robinett's vehicle veered off the right side of the roadway, overcorrected, drove across the centerline, overcorrected, and veered off the right side of the roadway, where it struck a tree. The weather conditions at the time of the crash were cloudy and the roadway was wet. The accident report states that Mr. Robinett was driving too fast for the conditions. (LINA 000193-96[1]). A toxicology report indicated that Mr. Robinett's ethyl alcohol level at the time of the crash was 0.232%. (LINA 000033). The legal limit in Missouri is 0.08%.

### Plaintiff's Claim and Appeal

Plaintiff submitted her claim for accidental death benefits on January 16, 2008. (LINA 000217-18). In its consideration of her claim, defendant examined the claim form, the death certificate, the accident report, the toxicology report, and the policy. Defendant denied plaintiff's claim on June 30, 2008. The denial letter stated in part:

> [E]very state in the nation has criminalized drunk driving and has determined through the imposition of criminal punishment for the offense, that the conduct must be deterred. The legislative purpose of drunken driving laws is to protect the public and guard against the threat of injury. All licensed motorists throughout the United States are on notice, by operation of law, of the state-declared prohibitions against drunk-driving and its consequences.
>
> Therefore, as Mr. Robinett would have been aware of the risks involved in operating his vehicle while under the influence, his death was not an accident according to the terms of the Policy. Therefore, no Accidental Death Benefits are payable under [the Policy].

(LINA 000034-36).

---

[1]Citations to "LINA ---" refer to the administrative record. [Doc. #53].

Plaintiff appealed the denial of benefits, asserting four bases for reversal: (1) Mr. Robinett's death qualified as an accident under the concurring opinion in <u>King v. Hartford Life & Acc. Ins. Co.</u>, 414 F.3d 994 (8th Cir. 2005); (2) events preceding Mr. Robinett's death establish that his death was an accident; (3) plaintiff's forensic toxicologist opined that the manner in which blood sample was drawn might have resulted in an artificially elevated blood alcohol level; and (4) Mr. Robinett was a functional alcoholic and would not have been aware of the effects of an elevated blood alcohol level. (LINA 000042-44).

Plaintiff submitted additional evidence in support of her appeal. Statements from family members and work associates established that Mr. Robinett operated a "stamped concrete" business and frequently traveled out of town on contract work. At the time of the incident, Mr. Robinett was returning to Missouri from a job site in Georgia; a piece of heavy equipment was loaded in the bed of his pickup truck. (LINA 000116). He left Georgia at about 3:00 in the morning, in keeping with his usual practice when traveling long distances. (LINA 000115, 000164). He was described as a slow and cautious driver. Mr. Robinett had a telephone conversation with his father-in-law James Buzzanga shortly before the accident; Mr. Buzzanga reported that he did not seem intoxicated during the conversation. (LINA 000115).

Mr. Robinett had a long-standing habit of drinking alcohol in significant quantities in order to control pain in his back and hands. The record includes an excerpt from a deposition he gave in 2005 in connection with a worker's compensation claim. He testified at that time that he drank a fifth of bourbon every two days; it was his usual habit to have four or five drinks every morning upon rising so he could go to work. (LINA 000174). Associates familiar with his habits stated that he drank every day at

the conclusion of work in response to pain. (LINA 000159-160). Plaintiff's expert, Christopher Long, Ph.D., opined that, "a person with Mr. Robinett's history of regular consumption of high amounts of alcohol would not be aware that he was intoxicated at a blood alcohol level of 0.232%." (LINA 000096). Dr. Long did not state that Mr. Robinett was unimpaired.

Mr. Robinett's alcohol level was determined by means of a blood sample taken at the scene of the accident. Mississippi County Coroner Terry Parker drew a blood sample by "tap[ping] the heart directly with the needle and syringe provided b[y] the Missouri State Highway Patrol." (LINA 000080). Dr. Long stated that, when performed following car accidents, this method of drawing blood may result in artificially elevated blood alcohol readings if the stomach or diaphragm ruptured during the accident or if the needle entered the esophagus. (LINA 000097).

Plaintiff also submitted a government report that plaintiff contends shows that, while there are more than 150 million instances of alcohol impaired driving each year, there were only 12,998 alcohol-related fatalities in 2007.[2]

Defendant denied plaintiff's appeal in a letter dated August 19, 2009, stating:

> Injury or death resulting from driving while highly intoxicated is considered foreseeable and is not covered by the provisions of [the] policy. Driving when highly intoxicated precludes a finding that a death is Accidental. . . [T]he policy definition of a Covered Accident requires that a loss not be foreseeable.
>
> The toxicology report indicated that Mr. Robinett had a high level of alcohol in his system at the time of the motor vehicle crash. All licensed motorists throughout the United States are on notice, by operation of law, of the state-declared prohibitions against drunk driving and its consequences. Additionally, there is an abundant availability of public information regarding the dangers of driving highly intoxicated. It is extremely unlikely that Mr. Robinett was

---

[2]*2007 Traffic Safety Annual Assesment -- Alcohol Impaired Driving Fatalities*, (Nat'l Hwy. Traffic Safety Admin., Nat'l Ctr for Statistics and Analysis) (August 2008) (LINA 000064-76).

-4-

unaware of the risks associated with his behavior. Therefore, driving while highly intoxicated is a foreseeable loss and therefore no benefits are payable under the provisions of [the] policy.

Therefore, based upon the evidence that we have gathered, Mr. Robinett died as a result of his own voluntary actions, namely operating a motor vehicle while highly intoxicated, and we have concluded that his death was not accidental but was the foreseeable consequence of his actions.

(LINA 00034-36).

With respect to the statistical evidence that plaintiff submitted on appeal, the reviewer wrote:

[T]here is no requirement to engage in an analysis of statistical probabilities in determining whether a covered loss is reasonably foreseeable and, therefore accidental in ERISA-governed accidental death and dismemberment jurisprudence. [LINA] as Claims Administrator expressly declines to employ statistical probabilities in determining the accidental nature of a covered loss. Instead, in accordance with the federal common law of ERISA, the analysis is concerned with what a reasonable person would perceive to be the reasonably foreseeable consequences of their intentional conduct.

Regarding plaintiff's contention that "heart blood results" are prone to error due to possible contamination from alcohol in the stomach, defendant noted that there was no medical evidence that Mr. Robinett suffered a rupture of the stomach or diaphragm or that the needle used to draw the blood passed through the esophagus. Id.

### Relevant Policy Provisions

Mr. Robinett was insured under a group accident policy issued to plaintiff's employer, BJC Health Care; plaintiff is named as his beneficiary under the policy. The policy provides that benefits are paid:

[F]or loss from bodily injuries:

- a) caused by an accident which happens while an insured is covered by this policy; and

- b) which, directly and from no other cause, result in a covered loss.

(LINA 000003).

Under the policy, benefits are not available for losses caused by sickness, disease, bodily infirmity, or by any listed exclusion. Id. The policy excludes, among other things, coverage for loss resulting from "intentionally self-inflicted injuries, or any attempt thereat" while sane, and "[v]oluntary self-administration of any drug or chemical substance not prescribed by a licensed physician." (LINA 000005-6). The policy does not contain an exclusion for death or injury resulting from alcohol intoxication. It does not include a definition of "accident."

The policy further states:

> For plans subject to [ERISA], the Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has selected the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact.

(LINA 000007).

## II. Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).

### III. Discussion

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When, as is the case here, the plan gives the administrator discretion to determine benefit eligibility or construe the terms of the plan, the administrator's decision is reviewed under a deferential abuse of discretion standard. Janssen v. Minneapolis Auto Dealers Ben. Fund, 477 F.3d 1109, 1113 (8th Cir. 2006).

#### A. Conflict of Interest

Plaintiff argues that the Court should apply a less deferential standard of review because defendant has a conflict of interest. A conflict of interest exists when the entity that administers the plan "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2346 (2008). The presence of a conflict of interest does not entitle

a claimant to *de novo* review, however. <u>Wakkinen v. UNUM Life Ins. Co. of America</u>, 531 F.3d 575, 581 (8th Cir. 2008). Rather, the court considers a conflict of interest as a factor in determining whether there was an abuse of discretion:

> [W]hen judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. . . . Any factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. [A] conflict of interest . . ., for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

<u>Glenn</u>, 128 S. Ct. at 2351.

Because the defendant here decides which claims to pay and is responsible for paying benefits, a potential conflict of interest exists. The uncontested testimony of Brian Billeter establishes that defendant has taken measures to minimize this potential conflict of interest. Employees in the claims department are encouraged to pay all legitimate claims and defendant has not established numerical guidelines or quotas regarding claim denials and payments. Employees deciding claims are paid fixed salaries that are unrelated to the amount or number of claims that are paid or denied; their benefits, bonuses, commissions, promotions, and other incentives are independent of the number of claims that they approve or deny. Employees are evaluated "in part, on the quality of their claim decisions, *i.e.*, whether the claims were handled correctly in accordance with the applicable plan documents. They are also evaluated on the timeliness and accuracy of their claim decisions." Timeliness and accuracy of claims decisions are checked by the audit department, which reviews claim

files on a quarterly basis. The appeals unit is maintained separately from the claims department. Employees making decisions regarding claims on appeal conduct an independent assessment of the claim decision and they do not discuss the claim with the person who made the initial benefits determination. Finally, the claims and appeals units are physically and functionally separate from the financial underwriting unit. Thus, while the conflict of interest inherent in defendant's dual role is a factor entitled to some weight in determining whether an abuse of discretion occurred, it is not a factor that merits significant weight under the circumstances of this case.

Plaintiff also contends that defendant committed procedural irregularities that warrant less deferential review. A procedural irregularity occurs when a decision is made "without reflection or judgment," and is "the product of an arbitrary decision or the plan administrator's whim." Parkman v. Prudential Ins. Co., 439 F.3d. 767, 772 n.5 (8th Cir. 2006) (internal citations omitted). The mere presence of a procedural irregularity does not warrant a less deferential standard, however. Hillery v. Metropolitan Life Ins. Co., 453 F.3d. 1087, 1090 (8th Cir. 2006). Before such heightened review applies, plaintiff "must show (1) that a serious procedural irregularity existed, which (2) caused a serious breach of the plan trustee's fiduciary duty to the plan beneficiary." Pralutsky v. Metropolitan Life Ins. Co., 435 F.3d 833, 838 (8th Cir. 2006) (quoting Buttram v. Central States, Southeast and Southwest Areas Health & Welf. Fund, 76 F.3d 896, 900 (8th Cir. 1996)).

Plaintiff alleges that defendant made its decision to deny benefits based solely on the toxicology report, without taking into account other factors, such as Mr. Robinett's habituation to alcohol, the road conditions, the fact that he had been driving for several hours, and his father-in-law's testimony regarding their telephone

conversation shortly before the crash. The Court believes that these allegations of error are more properly addressed to whether defendant reasonably assessed the facts (see below) and declines to treat them as examples of procedural irregularity.

In summary, the Court believes that the deferential abuse of discretion standard applies; the fact that defendant both decides claims and pays benefit awards is a factor entitled to some weight in assessing whether there was an abuse of discretion. Wakkinen, 531 F.3d at 581.

### B. Abuse of Discretion

Under the deferential "abuse of discretion" standard, the Court must defer to the decision made by the plan administrator unless the decision is arbitrary and capricious.[3] Jackson v. Prudential Ins. Co. of America, 530 F.3d 696, 701 (8th Cir. 2008); see also Wakkinen, 531 F.3d at 583 (courts will not disturb the administrator's decision if it was reasonable; *i.e.*, where substantial evidence exists to support the decision). An administrator's decision will be considered reasonable if "a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." Phillips-Foster v. UNUM Life Ins. Co. of America, 302 F.3d 785, 794 (8th Cir. 2002) (quoting Donaho v. FMC Corp., 74 F.3d 894, 899 (8th Cir. 1996) (abrogated on other grounds)). The administrator's decision need not be the only sensible one, so long as the decision provides a reasoned explanation, based on the evidence, in support of a particular outcome. Id. In reviewing for abuse of discretion, the Court must look to see if the administrator's

---

[3] "Abuse of discretion," "arbitrary and capricious," and "reasonable" are synonymous in the context of reviewing a denial of benefits under ERISA. West v. Aetna Life Ins. Co., 171 F. Supp.2d 856, 866 n.2 (N.D. Iowa 2001) (citing Donaho v. FMC Corp., 74 F.3d 894, 898-900 (8th Cir. 1996)).

decision was supported by substantial evidence, that is, "such evidence as a reasonable mind might accept as adequate to support a conclusion." King v. Hartford Life & Acc. Ins. Co., 414 F.3d 994, 999 (8th Cir. 2005). The "reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." Id.

Under the abuse-of-discretion standard, the court asks whether the administrator's interpretation of the plan was reasonable. Id. The Eighth Circuit has identified the following factors to be considered in this analysis: (1) whether the plan administrator's interpretation is consistent with the goals of the policy; (2) whether the interpretation renders any language in the policy meaningless or internally inconsistent; (3) whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the term "accident" consistently; and (5) whether the interpretation is contrary to the clear language of the policy. Id. (citing Finley v. Special Agents Mut. Ben. Ass'n, Inc., 957 F.2d 617, 621 (8th Cir. 1992)). If the interpretation is reasonable, the court then examines whether the plan administrator reasonably applied that interpretation to the facts of the claim. Id. at 1014 (Gruender, J., dissenting); West v. Aetna Life Ins. Co., 171 F. Supp. 2d 856, 866 (N.D. Iowa 2001) (noting that the five-factor test is not "instructive" when reviewing the plan administrator's determination of the facts). For this inquiry, courts focus on whether the decision is supported by substantial evidence, which is more than a scintilla but less than a preponderance. Id.

At issue here is defendant's interpretation of the term "accident," a term that is not defined in the plan. The initial denial letter stated that the claim was denied because Mr. Robinett "would have been aware of the risks involved in operating his

vehicle while under the influence [and therefore] his death was not an Accident according to the terms of the Policy." In its letter denying plaintiff's appeal, defendant stated:

> Injury or death resulting from driving while highly intoxicated is considered <u>foreseeable</u> and is not covered by the . . . Policy. Driving while highly intoxicated precludes a finding that death is Accidental. As mentioned previously, <u>the policy definition of a Covered Accident means that a loss not be foreseeable</u>. . . It is extremely unlikely that Mr. Robinett was <u>unaware of the risks associated with his behavior</u>. . . Mr. Robinett died as a result of his <u>own voluntary actions</u>, namely operating a motor vehicle while highly intoxicated, and we have concluded that his death was not accidental but was <u>the foreseeable consequence of his actions</u>. . . . [I]n accordance with the federal common law of ERISA, the analysis is concerned with what a <u>reasonable person would perceive to be the reasonably foreseeable consequences of their conduct</u>.

(emphasis added).

In response to an interrogatory, defendant defined "accident" as "a sudden, unforeseeable external event." [Doc. #50-3]. In his deposition, Regional Claims Manager Brian Billeter testified that this is the definition given in the policies issued by defendant that do contain a definition of the term. [Doc. #49-1 at 16].

The Court cannot reach the question of whether defendant reasonably interpreted the term "accident," and applied that interpretation to the facts, because defendant has now asserted that the Court should apply the test set forth by the First Circuit in <u>Wickman v. Northwestern Nat'l Ins. Co.</u>, 908 F.2d 1077, 1088 (1st Cir. 1990). Under <u>Wickman</u>, the process for determining whether an insured's death or injury was accidental under a particular policy is based on (1) a determination of the insured's actual expectations, and (2) a determination of whether the insured's actual expectations were reasonable from an objective viewpoint.[4] <u>West</u>, 171 F. Supp. 2d at

---

[4]"This analysis will prevent unrealistic expectations from undermining the purpose of accident insurance." <u>Wickman</u>, 908 F.2d at 1088.

883.  "The operative inquiry into the insured's 'expectations' . . . concern[s] the insured's state of mind at the time of the incident that caused his death, not at the time the policy was purchased."  Stamp v. Metropolitan Life Ins. Co., 531 F.3d 84, 88 (1st Cir. 2008).

In adopting this formulation, the First Circuit rejected an approach that distinguishes between "accidental means" and "accidental result":

> Under this approach, where the insurance contract insures against "accidental means," the means which produced death or injury must have been unintentional.  According to this interpretation, <u>if the act proximately leading to injury is intentional, then so is the result</u>, even if the result itself was neither intended nor expected.  To constitute an accident under this standard, the cause of the injury, as Couch explains, must be "unforeseen, unexpected, and unusual; happening or coming by chance without design, that is casual or fortuitous, as opposed to designed or intended." 10 Couch on Insurance 2d § 41:28, 40 (1982).

Id. at 1085 (emphasis added).

Under the alternative standard adopted by the court in Wickman, an event is an accident if the decedent did not subjectively expect to suffer an injury similar in type or kind to the injury suffered, and the suppositions underlying that expectation were reasonable.  McClelland v. Life Ins. Co. of North America, 2010 WL 389369, *5 (D. Minn. Sept. 30, 2010).  "The determination of what suppositions are unreasonable should be made from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." Wickman, 908 F.2d at 1088.  If the evidence is insufficient to determine the decedent's subjective expectation, the question then is whether "a reasonable person, with background and characteristics similar to the insured, would have viewed <u>the injury as highly likely</u> to occur as a result of the insured's intentional conduct." Id. (emphasis added).

Defendant's assertion that this Court must apply the Wickman standard is odd in that there is no indication in this record that defendant attempted to ascertain Mr. Robinett's actual expectations or whether a reasonable person would have viewed Mr. Robinett's death as "highly likely to occur." Defendant did not apply the Wickman standard in its initial consideration and appeal of plaintiff's claim, and its assertion of this standard in litigation is exactly the type of *post hoc* rationale that the Eighth Circuit rejected in King. 414 F.3d at 1003-04. "Without a stated rationale from the administrator applying what [defendant] now says is the correct legal standard, we cannot determine whether a proffered interpretation of 'accidental' is reasonable, or whether there is substantial evidence to support a denial of benefits under such an interpretation." Id. at 1004. The Eighth Circuit further stated that, under this circumstance,

> the proper remedy is to return the case to the administrator for reevaluation of the claim under what [defendant] says is the correct standard. . . [W]hen an administrator abandons in litigation its original basis for denying benefits, the better course generally is to return the case to the administrator, rather than to conduct *de novo* review under a plan interpretation offered for the first time in litigation. . . For '[i]t is not the court's function *ab initio* to apply the correct standard to [the participant's] claim. That function, under the Plan, is reserved to the Plan administrator.

Id. at 1005-06 (citations omitted). See also McClelland v. Life Ins. Co. of North America, No. 0:08-4945, Memo. & Ord. at 26 (D. Minn. Oct. 29, 2009); Blankenship v. Zurich American Ins. Co., No. 4:08CV604 JCH, 2009WL775579 *7 (E.D. Mo. March 20, 2009).

On remand, defendant must make an individualized determination of whether Mr. Robinett's death resulted from an accident, as defined by Wickman. Defendant may not apply a *per se* rule regarding drunk driving, as such a rule is incompatible with an individualized determination. See LaAsmar v. Phelps Dodge Corp. Life,

-14-

Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 802 (10th Cir. 2010) (listing cases rejecting *per se* rule).

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. #48] is **denied**.

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment [Doc. #50] is **denied**.

**IT IS FURTHER ORDERED** that plaintiff Deborah Buzzanga's claim for benefits is remanded to the administrator for reconsideration under the standard set forth in Wickman v. Northwestern Nat. Ins. Co., 908 F. 2d 1077 (1st Cir. 1990).

                                                    _____
                                                    CAROL E. JACKSON
                                                    UNITED STATES DISTRICT JUDGE

Dated this 28th day of December, 2010.