UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DEBORAH BUZZANGA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     Case No. 4:09-CV-1353 (CEJ) |
| | ) |
| LIFE INSURANCE COMPANY OF | ) |
| NORTH AMERICA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant's second motion for summary judgment. Plaintiff has filed a response in opposition in which she asks the Court to deny the defendant's motion and to grant summary judgment in her favor.

### I.  Procedural Background

Plaintiff Deborah Buzzanga brings this action pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1), to recover accidental death benefits she asserts are due under a group accident policy issued by defendant Life Insurance Company of North America (LINA) to her employer. Plaintiff submitted a claim after her husband and covered dependent, Garry C. Robinett, died in a single-vehicle accident. LINA denied the claim, based on a finding that Mr. Robinett's blood alcohol level was above the legal limit at the time of the accident. Plaintiff alleges that the denial constitutes a breach of fiduciary duty and an abuse of discretion and was arbitrary and capricious.

The parties submitted cross-motions for summary judgment. In its motion, LINA asserted that the Court should apply the definition of accident set forth by the First Circuit in <u>Wickman v. Northwestern Nat'l Ins. Co.</u>, 908 F.2d 1077 (1st Cir. 1990).

The <u>Wickman</u> definition is not the same as the standard LINA applied during the initial review and appeal. Thus, the Court remanded the matter so that LINA could reevaluate the claim under the <u>Wickman</u> standard. <u>See</u> Memorandum and Order (December 28, 2010) [Doc. #64]. Defendant completed its review on remand and once again denied plaintiff's claim. Plaintiff filed an amended complaint in which she alleges that defendant failed to properly apply the <u>Wickman</u> standard and defendant again moved for summary judgment. Thereafter, the Eighth Circuit Court of Appeals addressed defendant's application of <u>Wickman</u> in the case of another death that occurred when the decedent was driving with an elevated blood alcohol level. <u>McClelland v. Life Ins. Co. of North America</u>, 679 F.3d 755 (8th Cir. 2012). The Court considers defendant's motion in light of <u>McClelland</u>.

## II. **Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. <u>AgriStor Leasing v. Farrow</u>, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986); <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other

evidence, showing that a genuine issue of material fact exists.  United of Omaha Life Ins. Co. v. Honea, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).

In addition to LINA's administrative record for the claim, the Court has received the deposition of regional claims manager Brian Billeter and the supplemental materials plaintiff submitted on remand.[1]

### III.    **Factual Background**

#### **Policy Provisions**

Mr. Robinett was insured under a group accident policy issued to plaintiff's employer, BJC Health Care; plaintiff is named as Mr. Robinett's beneficiary under the policy.  The benefit payable upon death of a spouse is $200,000, with an additional $50,000 if the decedent was wearing a seatbelt at the time of a motor vehicle accident. The provides that benefits are paid:

[F]or loss from bodily injuries:

      a)    caused by an accident which happens while an insured is covered by this policy; and

      b)    which, directly and from no other cause, result in a covered loss.

---

[1]These additional materials include an expert report prepared by Shannon C. Miller, M.D., and sworn statements from plaintiff Deborah Buzzanga, her mother Patricia Buzzanga, and Rick Bidrowski, who used to work with Mr. Robinett.

LINA 000003.[2]

Benefits are not payable for losses caused by sickness, disease, bodily infirmity, or any listed exclusion. Id. The policy excludes, among other things, coverage for loss resulting from "intentionally self-inflicted injuries, or any attempt thereat" while sane, and "[v]oluntary self-administration of any drug or chemical substance not prescribed by a licensed physician." LINA 000005-6. The policy does not contain an exclusion for death or injury resulting from alcohol intoxication or a definition of "accident." The policy grants defendant "the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact." LINA 000007.

### The Accident

Decedent Garry Robinett was killed in a single vehicle accident at 8:10 a.m. on December 22, 2007, in Mississippi County, Missouri. He was driving a pickup truck with a piece of construction equipment loaded in the bed. According to the Missouri Uniform Accident Report, Mr. Robinett was just exiting a left-hand curve when his vehicle veered off the right side of the roadway, overcorrected, drove just over the centerline, overcorrected again, and veered off the right side of the roadway. LINA 000193-96. The truck struck a tree, with the driver's side door as the point of impact. The weather conditions at the time of the crash were cloudy and the roadway was wet. The accident report states that Mr. Robinett was driving too fast for the conditions. He was wearing his seatbelt. A toxicology report indicated that Mr. Robinett's ethyl alcohol level at the time of the crash was 0.232%. LINA 000033. The legal limit in Missouri is 0.08%. There is no indication that any alcohol was recovered from the truck.

---

[2]Citations to "LINA ---" refer to the administrative record. [Doc. #53].

A fuel receipt frm Cartersville, Georgia, shows that Mr. Robinett purchased gas at 3:21 a.m on December 22nd. LINA 000078. Cell phone records establish that he made and received ten calls between 3:51 a.m. and 7:59 a.m. LINA 000171.

### Plaintiff's Claim and Appeal

Plaintiff submitted her claim for accidental death benefits on January 16, 2008. LINA 000217-18. In its consideration of her claim, defendant examined the claim form, the death certificate, the accident report, the toxicology report, and the policy. Defendant denied plaintiff's claim on June 30, 2008. The denial letter stated in part:

> [E]very state in the nation has criminalized drunk driving and has determined through the imposition of criminal punishment for the offense, that the conduct must be deterred. The legislative purpose of drunken driving laws is to protect the public and guard against the threat of injury. All licensed motorists throughout the United States are on notice, by operation of law, of the state-declared prohibitions against drunk-driving and its consequences.
>
> Therefore, as Mr. Robinett would have been aware of the risks involved in operating his vehicle while under the influence, his death was not an accident according to the terms of the Policy. Therefore, no Accidental Death Benefits are payable under [the Policy].

LINA 000034-36.

Plaintiff appealed the denial of benefits, asserting four bases for reversal: (1) Mr. Robinett's death qualified as an accident under the concurring opinion in King v. Hartford Life & Acc. Ins. Co., 414 F.3d 994 (8th Cir. 2005); (2) events preceding Mr. Robinett's death establish that his death was an accident; (3) the manner in which the blood sample was drawn might have resulted in an artificially elevated blood alcohol level; and (4) Mr. Robinett was a functional alcoholic and would not have been aware of the effects of an elevated blood alcohol level. LINA 000042-44. Plaintiff submitted additional evidence, including two research reports regarding alcohol-impaired driving; an expert report from Christopher Long, M.D.; a letter from the Mississippi County

Coroner; statements from people who knew Mr. Robinett; a portion of Mr. Robinett's deposition testimony in a 2005 worker's compensation proceeding; a fuel receipt; and cell phone records. The statements provide information pertinent to the analysis under Wickman and thus are discussed in some detail.

Larry Kolb is a Georgia-based general contractor specializing in hotel renovation. LINA 000128-47. He first hired Mr. Robinett as a subcontractor 13 or 14 years before the accident for a job in the St. Louis area and continued to hire him for work all around the country. The typical hotel job took about four months to complete, during which time the crew shared living quarters. In the course of working and living together, Mr. Kolb and Mr. Robinett developed a friendship. Mr. Kolb described Mr. Robinett as "one of the hardest working fellas" he ever met. LINA 000135. Mr. Robinett's trade -- stamped concrete -- was very physically demanding, and he had significant pain in his arms, hands, and back. Despite the pain, Mr. Kolb never knew Mr. Robinett to take time off work. At the end of a workday, Mr. Robinett would return to his room and drink for an hour or two before going to bed around 8:00 p.m. and rising again at 5:00 in the morning. Mr. Kolb stated that this was Mr. Robinett's daily routine for at least ten years. He never appeared intoxicated on the job, even in the early morning hours.

Mr. Robinett typically moved directly from one job site to another as each was completed, generally spending eleven months out of the year on the road. According to Mr. Kolb, Mr. Robinett hauled his own heavy equipment and was an extremely cautious driver, never exceeding the speed limit. At the end of a job, he would generally load up his equipment and start for the next site, often at 3:00 or 4:00 in the morning.

-6-

Like Mr. Kolb, Ken Moore also met Mr. Robinett through his work and became his friend. LINA 000149-69. Mr. Moore stated that he and Mr. Robinett spoke by phone two or three times a month. Mr. Moore observed that Mr. Robinett complained of pain in his wrists, even after he had surgery to address carpal tunnel syndrome. Mr. Robinett "just didn't like medication" and so drank to ease the pain. LINA 000160-61. Mr. Moore stated that Mr. Robinett was a slow driver, and was always the last car in a convoy. He confirmed Mr. Kolb's observations regarding Mr. Robinett's work habits.

James Buzzanga was Mr. Robinett's father-in-law. LINA 000099-126. He stated that, on December 22, 2007, Mr. Robinett was returning from a job site in Georgia with a piece of heavy equipment loaded in the bed of his pickup truck. He left Georgia at about 3:00 in the morning, in keeping with his usual practice when traveling long distances. At 8:00 that morning, Mr. Robinett called Mr. Buzzanga. According to Mr. Buzzanga, Mr. Robinett was on his way to another job. He asked Mr. Buzzanga to supervise a work crew for him in Bowling Green, Missouri. He did not seem intoxicated. The accident occurred at 8:10 a.m.

Mr. Buzzanga stated that Mr. Robinett was more like a son than a son-in-law to him and that they were in frequent contact, either in person when Mr. Robinett was in town or by phone when he was away. In the last few years of his life, Mr. Robinett complained more and more of the pain in his hands. He used to wrap his wrists in duct tape so that he could hold his tools straight while he worked. He tried and failed to get pain treatment through workers' compensation and used alcohol to make it possible to work.

Mr. Robinett had a long-standing habit of drinking alcohol in significant quantities in order to control pain in his back and hands. The record includes an excerpt from a

deposition he gave in 2005 in connection with a worker's compensation claim. He testified at that time that he drank a fifth of bourbon every two days; it was his usual habit to have four or five drinks every morning upon rising so he could go to work. LINA 000174. Plaintiff's expert, Christopher Long, Ph.D., opined that, "a person with Mr. Robinett's history of regular consumption of high amounts of alcohol would not be aware that he was intoxicated at a blood alcohol level of 0.232%." LINA 000096. Dr. Long did not state that Mr. Robinett was unimpaired.

Mr. Robinett's alcohol level at the time of the incident was determined by means of a blood sample taken at the scene of the accident. Mississippi County Coroner Terry Parker drew a blood sample by "tap[ping] the heart directly with the needle and syringe provided b[y] the Missouri State Highway Patrol." LINA 000080. Dr. Long stated that, when performed following car accidents, this method of drawing blood may result in artificially elevated blood alcohol readings if the stomach or diaphragm ruptured during the accident or if the needle entered the esophagus. LINA 000097.

Plaintiff also submitted government reports that she contends show that, while there are more than 150 million instances of alcohol impaired driving each year, there were only 12,998 alcohol-related fatalities in 2007.[3]

Defendant denied plaintiff's appeal in a letter dated August 19, 2009, stating:

Injury or death resulting from driving while highly intoxicated is considered foreseeable and is not covered by the provisions of [the] policy. Driving when highly intoxicated precludes a finding that a death is Accidental. . . [T]he policy definition of a Covered Accident requires that a loss not be foreseeable.

The toxicology report indicated that Mr. Robinett had a high level of alcohol in his system at the time of the motor vehicle crash. All licensed motorists

---

[3]2007 Traffic Safety Annual Assessment -- Alcohol Impaired Driving Fatalities, Nat'l Hwy. Traffic Safety Admin., Nat'l Ctr. for Statistics and Analysis (August 2008) LINA 000064-76.

throughout the United States are on notice, by operation of law, of the state-declared prohibitions against drunk driving and its consequences. Additionally, there is an abundant availability of public information regarding the dangers of driving highly intoxicated. It is extremely unlikely that Mr. Robinett was unaware of the risks associated with his behavior. Therefore, driving while highly intoxicated is a foreseeable loss and therefore no benefits are payable under the provisions of [the] policy.

Therefore, based upon the evidence that we have gathered, Mr. Robinett died as a result of his own voluntary actions, namely operating a motor vehicle while highly intoxicated, and we have concluded that his death was not accidental but was the foreseeable consequence of his actions.

LINA 00034-36 (emphasis added).

With respect to the statistical evidence that plaintiff submitted on appeal, the

claim reviewer wrote:

[T]here is no requirement to engage in an analysis of statistical probabilities in determining whether a covered loss is reasonably foreseeable and, therefore accidental in ERISA-governed accidental death and dismemberment jurisprudence. [LINA] as Claims Administrator expressly declines to employ statistical probabilities in determining the accidental nature of a covered loss. Instead, in accordance with the federal common law of ERISA, the analysis is concerned with what a reasonable person would perceive to be the reasonably foreseeable consequences of their intentional conduct.

Id. (emphasis added).

Regarding plaintiff's contention that "heart blood results" are prone to error due

to possible contamination from alcohol in the stomach, defendant noted that there was

no medical evidence that Mr. Robinett suffered a rupture of the stomach or diaphragm

or that the needle used to draw the blood passed through the esophagus.[4] Id.

### Plaintiff's Civil Action

Plaintiff filed this action after LINA denied her appeal. The parties submitted

cross-motions for summary judgment on the administrative record. Plaintiff argued

_____

[4]Mr. Robinett's body cavity was not opened and so there is no medical evidence with regard to the source of the blood sample or the injuries sustained by Mr. Robinett's internal organs. Report of Dr. Shannon C. Miller at 3. PLSUPP000004.

that the Court should apply a *de novo* standard of review because (1) LINA has an inherent conflict of interest and (2) there were numerous procedural irregularities in LINA's decision-making. Alternatively, plaintiff argued that, even under an abuse-of-discretion standard, the decision to deny benefits was arbitrary and capricious because LINA had not applied a consistent definition of "accident" throughout the claims process. Defendant argued that it was entitled to review under the deferential "abuse of discretion" standard, that its definition of the term "accident" as a "sudden unforeseeable external event" was not unreasonable; and that the Court should adopt the test articulated in <u>Wickman v. Northwestern Nat'l Ins. Co.</u>, 908 F.2d 1077, 1084 (1st Cir. 1990), to decide whether Mr. Robinett's death was an accident.

The Court determined that the abuse of discretion standard applied. The Court also found, however, that LINA operated under a conflict of interest because it both made the coverage decision and paid benefits. That conflict of interest was entitled to some weight in the Court's review of the claim decision. The Court next determined that LINA used a different definition of "accident" in its review of plaintiff's claim than the <u>Wickman</u> standard it advocated in litigation. Consistent with Eighth Circuit precedent, the Court remanded the matter to LINA for reconsideration under the <u>Wickman</u> standard. The Court directed LINA to "make an individualized determination of whether Mr. Robinett's death resulted from an accident, as defined by <u>Wickman</u>. Defendant may not apply a *per se* rule regarding drunk driving, as such a rule is incompatible with an individualized determination."

### LINA's Decision on Remand

Following the remand order, plaintiff provided LINA with a statement.[5]  LINA PLSUPP000041-92.  She stated that her husband had been working on a job in Georgia for two months at the time of the accident.  He had a job to bid on in Oklahoma but wanted to see his brother in Sikeston, Missouri.  She stated that his brother, with whom he was not on good terms, was dying and Mr. Robinett wanted to make amends.  She and Mr. Robinett had plans to meet at a hotel that evening for a romantic getaway.  He called her at 4:25 that morning, while she was getting ready for work.  She stated that they did not speak for very long but that he was in a good mood.  After the accident, plaintiff collected a message that he had left shortly before they talked; in that message, he spoke about their plans to see each other that night.

Plaintiff stated that Mr. Robinett had been in pain for the 25 years she had known him.  He had been a fireman when younger and was struck on the back by a falling beam.  As a result of the physical demands of his work, he had carpal tunnel syndrome and tennis elbow.  He was opposed to medication and drank bourbon to manage the pain.  It was his unvarying routine to drink at the completion of the work day and to get up early the next morning to sit in a hot tub.  Sometimes he would drink when he got up.   With respect to his driving habits, she stated that he was very serious about driving because it was essential to his livelihood.  As an example, she said he would not allow the radio to be played while he was driving.  He always loaded his own truck and trailer according to a plan and would redo the load if it varied from his specifications.  She stated that they were building units for their retirement income in Bowling Green, Missouri, and that he wanted her parents to do some siding work

---

[5]Defendant refused to consider this statement on remand and opposes plaintiff's attempt to introduce new evidence in this proceeding.  This issue will be addressed below.

while he was working on other jobs.  LINA treated plaintiff's statement as outside the administrative record and did not consider it.

Plaintiff also submitted the report of Shannon C. Miller, M.D., a Fellow of the American Society of Addiction Medicine.  LINA PLSUPP0002-40.  Based on his review of the administrative record, Dr. Miller opined that Mr. Robinett's drinking was effectively controlled,  and it improved, rather than degraded, his occupational functioning.  Like Dr. Long, Dr. Miller asserted that the blind heart-stick method for obtaining a blood specimen was inappropriate in the case of death by blunt trauma. In particular, Mr. Robinett died in an accident where the impact was so strong and sudden that his neck was broken, raising the likelihood of tracheal aspiration.  Dr. Miller further stated that, "Absent this ill-advised alcohol sampling, there is no data to support Mr. Robinett to be intoxicated while driving."   Thus, "a more plausible explanation" is that his death resulted from "the challenges of navigating a wet road in December with a curve to the left while distracted by both making and receiving mobile phone calls and while pulling a load which was both heavy and unfamiliar to the driver."  Dr. Miller concluded that the data did not support a finding "that Mr. Robinett would have believed his death was highly likely to occur."  PLSUPP000006.  LINA refused to consider this additional evidence as well.

On January 31, 2011, defendant again denied plaintiff's claim.  LINA 000343-46. The denial letter stated in relevant part:

> Because Mr. Robinett's crash was fatal, it is impossible for us to determine whether he subjectively believed that driving too fast, on wet roads, with a blood alcohol level significantly higher than the legal limit, was highly likely to lead to a serious injury.  However, even if Mr. Robinett had an expectation of avoiding injury due to his alleged functional alcoholism, his belief does not render his death accidental because such expectations were objectively unreasonable.

* * *

Mr. Robinett was traveling . . . at a rate of speed above what was safe for conditions . . . on a wet roadway, with a heavy piece of equipment in the bed of his pickup truck. Mr. Robinett had been on the road since 3:00 AM, and when the crash occurred at 8:10 AM his blood alcohol concentration was 0.232%, nearly triple the legal limit for driving in every state in the United States. Any reasonable person would be aware that such behavior is highly likely to lead to serious injury.

* * *

[D]espite the submission of evidence from individuals who knew Mr. Robinett and described him as a "functional alcoholic", there is no information to support the conclusion that Mr. Robinett would not have been adversely affected by alcohol at a BAC level of .232%. If Mr. Robinett was no longer capable of recognizing the effects of alcohol due to functional alcoholism, this would in fact make him more dangerous as a motorist.

Statistics regarding the likelihood of surviving while driving drunk also do not render Mr. Robinett's beliefs reasonable. These statistics often fail to take into account *how* intoxicated an individual was at the time he arrived at his destination safely. Common sense dictates, however, that the likelihood of injury increases as the driver's level of intoxication increases. Here, Mr. Robinett was not driving with a blood alcohol content only slightly higher than the legal limit. He was driving – at risk to both himself and other motorists – with a blood alcohol level of nearly three time the 0.8% permitted in Missouri. A reasonable person, even a person with a history of drinking, recognizes that the more drunk you become, the more likely you are to be injured or killed.

All licensed motorists in the United States are on notice by operation of law of the prohibition against drinking and driving, and the serious consequences of this action. There is an abundance of public information regarding the dangers of drinking and driving, all of which is readily available to the general public. Thus, Mr. Robinett's death cannot be considered accidental in nature, as it is the outcome of his own actions in driving as outlined above, actions that a reasonable person would view as likely to cause grave injury to themselves or someone else.

LINA 000343-000346 (emphasis added).

## IV. Discussion

Under the deferential "abuse of discretion" standard, the Court must defer to the

decision made by the plan administrator unless the decision is arbitrary and capricious.

Jackson v. Prudential Ins. Co. of America, 530 F.3d 696, 701 (8th Cir. 2008); see also

Wakkinen v. UNUM Life Ins. Co. of America, 531 F.3d 575, 583 (8th Cir. 2008) (courts will not disturb the administrator's decision if it was reasonable; *i.e.*, where substantial evidence exists to support the decision). An administrator's decision will be considered reasonable if "a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." Phillips-Foster v. UNUM Life Ins. Co. of America, 302 F.3d 785, 794 (8th Cir. 2002) (quoting Donaho v. FMC Corp., 74 F.3d 894, 899 (8th Cir. 1996) (abrogated on other grounds)). The administrator's decision need not be the only sensible one, so long as the decision provides a reasoned explanation, based on the evidence, in support of a particular outcome. Id. In reviewing for abuse of discretion, the Court must look to see if the administrator's decision was supported by substantial evidence, that is, "such evidence as a reasonable mind might accept as adequate to support a conclusion." King v. Hartford Life & Acc. Ins. Co., 414 F.3d 994, 999 (8th Cir. 2005). The "reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." Id.

The Eighth Circuit has identified the following factors to be considered when determining whether a plan administrator's interpretation of the plan was reasonable: (1) whether the interpretation is consistent with the goals of the policy; (2) whether the interpretation renders any language in the policy meaningless or internally inconsistent; (3) whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the words at issue consistently; and (5) whether the interpretation is contrary to the clear

language of the policy. Id. (citing Finley v. Special Agents Mut. Ben. Ass'n, Inc., 957 F.2d 617, 621 (8th Cir. 1992)).

When the court is "asked to review the administrator's evaluation of the facts to determine the application of the Plan . . . the five-factor test is not instructive." West v. Aetna Life Ins. Co., 171 F. Supp. 2d 856, 866-67 (N.D. Iowa 2001) (citing Farley v. Arkansas Blue Cross & Blue Shield, 147 F.3d 774, 777 n.6 (8th Cir. 1998)). Instead, in such circumstances, "[i]n determining reasonableness, [courts of this circuit] focus on whether the decision is supported by substantial evidence." Id. (alteration in original). "Substantial evidence" is "more than a scintilla but less than a preponderance." Id. (citations omitted).

Plaintiff attempted to submit additional materials to LINA for its review on remand but LINA refused to consider them.[6] LINA cites the following cases for the proposition that there is a presumption against supplementing the administrative record with outside evidence: Brown v. Seitz Foods, Inc. Disability Ben. Plan, 140 F.3d 1198,1200 (8th Cir. 1998); Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641-41 (8th Cir. 1997); Jewell v. Life Ins. Co. of North America, 508 F.3d 1303, 1309 (10th Cir. 2007); Davidson v. Prudential Ins. Co. of America, 953 F.2d 1093, 1095 (8th Cir. 1992). At issue in each of these cases was whether the district court had authority to consider additional evidence submitted in litigation but not to the plan administrator. See id. ("Thus, if Davidson believed the evidence he now offers was necessary for Prudential to make a proper benefits determination, Davidson should have obtained this evidence and submitted it to Prudential."); see also Loberg v. Cigna Group Ins.,

_____

[6]The decisionmaker on remand testified at deposition that he was unaware that additional evidence had been submitted to LINA after the remand. Brian Billeter Deposition at p. 78 [Doc. #88-1].

-15-

No. 8:09CV280, 2012 WL 3527718, at *4 (D. Neb. Aug. 14, 2012) (on remand, Cigna considered report of independent forensic toxicologist); McClelland v. Life Ins. Co/ of No. America, No. 08-4945 (MJD/AJB), 2010 WL 3893695, at *5 (D. Minn. Sept. 30, 2010) (on remand, LINA considered plaintiff's additional evidence). Because plaintiff gave LINA the opportunity to consider this additional evidence in the first instance, the Court may properly consider it on abuse of discretion review.

At issue here is defendant's application of the Wickman standard for defining the term "accident." Under Wickman, the process for determining whether an insured's death or injury was accidental under a particular policy is based on (1) a determination of the insured's actual expectations, and (2) a determination of whether the insured's actual expectations were reasonable from an objective viewpoint. West v. Aetna Life Ins. Co., 171 F. Supp. 2d 856, 883 (N.D. Iowa 2001). "This analysis will prevent unrealistic expectations from undermining the purpose of accident insurance." Wickman, 908 F.2d at 1088. "The operative inquiry into the insured's 'expectations' . . . concern[s] the insured's state of mind at the time of the incident that caused his death, not at the time the policy was purchased." Stamp v. Metropolitan Life Ins. Co., 531 F.3d 84, 88 (1st Cir. 2008). "The determination of what suppositions are unreasonable should be made from the perspective of the insured, allowing [him] great latitude and taking into account [his] personal characteristics and experiences." Wickman, 908 F.2d at 1088. "[T]he Wickman test requires, if possible, a subjective look at the insured's state of mind." McCelland, 679 F.3d at 760. An insurer may not rely on a "categorical conclusion that those who drink and drive should reasonably expect to be killed." Id.

The Court finds that LINA improperly applied the Wickman test by failing to reasonably analyze Mr. Robinett's subjective expectations.  In denying the claim on remand, LINA asserted that, because Mr. Robinett died, it was impossible to determine his subjective expectations of the risk inherent in his conduct.  See also McClelland v. Life Ins. Co. of North America, No. 08-4945 (MJD/AJB), 2010 WL 3893695 (D. Minn. Sept. 30, 2010) (on remand in order to evaluate claim under Wickman, defendant concluded it was "difficult to perform a direct assessment of Mr. McClelland's subjective expectations").  This categorical assertion, made without examination of the evidence available to LINA, amounts to an abuse of discretion.  See McClelland, 679 F.3d at 761 (it was error to rely heavily on objective analysis alone when subjective evidence was available).

Brian Billeter, LINA's regional claims manager, completed the review on remand. On August 30, 2011, Mr. Billeter gave a deposition and testified as follows:

Q:    [W]hat was different in your reconsideration on remand?

A:    I don't really recollect exactly what the remand order said, but there was some additional information in the remand order.

Q:    Did you apply a different definition of accident?

A:    I believe we applied the same definition of accident as a sudden unforeseeable external event.

Q:    So in your decision on remand, the definition of accident that you applied was a sudden unforeseen external event?

A:    That's correct.

Q:    Is a sudden unforeseen external event . . . different than an analysis based upon highly likely to occur?

A:    I think in this case we take a look at the component of unforeseen and determine whether or not something from an objective standpoint is reasonably likely to occur.

\* \* \*

Q:     Do you know what the <u>Wickman</u> standard is?

A:     I believe it lays down the requirements for looking at whether or not an individual would have an expectation of harm with regard to their actions.

Q:     And is that different from a foreseeability analysis in your opinion?

A:     No.  I think it is the same general type of idea that foreseeability becomes the reasonable expectation of harm as a result of your own actions.

Tr. 50-52.

Later in his deposition, Mr. Billeter testified that the crash would have been classified as an accident if Mr. Robinett's blood alcohol level were zero even if he was traveling too fast on a wet road.  Tr. 71-72.  He also testified that "[d]river inattention in and of itself is not a basis for deeming something to be non-accidental in nature." Tr. 74.  Finally, if he were convinced that a driver's intoxication was the only cause of the accident, "then we may determine that the claimant has not suffered an accident . . ."  Tr. 77.  This testimony confirms that LINA once again applied a *per se* exclusion for deaths in which the driver was intoxicated.

LINA cites the following portion of Mr. Billeter's testimony:

Q:     But you don't recall in the remand the court telling you to use a different definition than sudden unforeseeable external event?

\* \* \*

A:     I think it was just a re-analysis based upon that as well as what the expectations of an individual would be, which is the same general type of analysis.

\* \* \*

Q:     If I showed you the order would that refresh your recollection?

A:     Of course.  It says here, "On remand, Defendant must make an individualized determination that Mr. Robinett's death resulted from an accident as defined by <u>Wickman</u>.  Defendant may not apply a per [se] rule regarding

-18-

drunk driving, as such a rule is incompatible with an individualized determination."

Q:      So does that refresh your recollection . . .

A:      Yes. It was a component of the <u>Wickman</u> case "Whether a reasonable person with background and characteristics similar to the insured would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct."

Q:      And that sentence that you just read, is that your understanding of the definition of accident that the court was telling you to use on remand?

A:      I think there's still a baseline of the sudden unforeseeable external event. This is just a matter of taking into account the subjective expectations of this individual with regard to their actions and so therefore determining whether or not there is in fact a foreseeability component of the analysis. So it is a kind of refining of that particular set of terms. . . .

Q:      So is it your testimony that the definition of accident as defined by the <u>Wickman</u> case is a sudden unforeseeable external event?

A:      No. I think it is a refinement of that. It is a subjective expectations type of analysis, but that's still a foreseeability analysis in the larger picture. <u>It's still a question of whether or not the actions were foreseeable</u>. It's just from a subjective type of standpoint as to whether or not that individual would expect to have an injury occur as a result of their intentional conduct.

(<u>Id</u>. at 65-67) (emphasis added). LINA argues that this testimony establishes that Mr. Billeter properly understood the <u>Wickman</u> standard. That point is debatable. What is uncontrovertable, however, is that Mr. Billeter did not make an attempt to determine Mr. Robinett's subjective expectations of the likely outcome of his conduct on December 22, 2007.

Contrary to Mr. Billeter's statement that it was "impossible . . . to determine" what Mr. Robinett subjectively believed, the record was replete with evidence that he fully expected to survive his drive, as he had countless times before, and to meet his wife for a much-anticipated reunion. The decision to ignore this evidence "amounted to a faulty objective evaluation of the evidence, ignoring the subjective components

of the Wickman test that directs LINA to first determine the expectations of the insured, based upon the insured's personal characteristics and experiences." McClelland, 679 F.3d at 761 (citing Wickman, 908 F.2d at 1088). "Only when the evidence is insufficient to accurately determine the insured's subjective expectations at the time of the accident should the objective analysis be so heavily relied upon." Id. As in McClelland, "all of the subjective facts, and even some of the objective ones," point to the fact that [Mr. Robinett] reasonably did not think it highly likely that he would die" on December 22, 2007. Id.

LINA argues that McClelland is distinguishable. In that case, Mr. McClelland died in a motorcycle accident. He was not wearing a helmet. Observers stated that he was driving at speeds in excess of 90 miles per hour, weaving in and out of traffic, and possibly racing with another driver. His blood alcohol content was 0.203%. McCelland, 2010 WL 3893695 at *2. The administrative record included statements from people who had interacted with Mr. McClelland in the hours before his death and who observed that he did not appear intoxicated. In addition, there was testimony regarding his plans for the future. Defendant contends that the record in this matter simply does not contain the same contemporaneous, detailed information from which a determination of Mr. Robinett's subjective expectations can be made. The Court rejects this argument. First, it is clear that Mr. Billeter erroneously believed that Mr. Robinett's death precluded an inquiry into his subjective expectations. Thus, LINA's attempt to distinguish McClelland amounts to an impermissible *post hoc* rationalization at variance with the standard it applied on remand. See King 414 F.3d at 999 (court may not consider *post hoc* rationales). Second, as detailed above, there was evidence

relevant to the determination of Mr. Robinett's subjective expectations. LINA just declined to consider it.

Mr. Robinett's death resulted from an accident. In light of the conflict of interest and LINA's failure to consider the evidence before it, the Court concludes that LINA abused its discretion in denying benefits, because it improperly applied the Wickman standard and because substantial evidence does not support its decision. Plaintiff is entitled to recover benefits and thus judgment will be entered in her favor. See Advantage Consulting Group, Ltd. v. ADT Sec. Systems, Inc.,306 F.3d 582, 588 (8th Cir. 2002) (court may grant summary judgment *sua sponte* so long as the losing party was on notice that it had to come forward with all of its evidence) (citation omitted).

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Doc. #69] is **denied**.

Judgment in accordance with this Memorandum and Order will be separately entered.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 4th day of January, 2013.